EPWORTH LEAGUE TRAINING ASSEMBLY *v.* OLNEY.

1. EASEMENTS—CONTRACTS—CONSTRUCTION.

Complainant corporation was organized to establish a training school for members of the Epworth League, a young people's society carried on in connection with the Methodist Church, as well as a summer school for young preachers, camp meetings, and other facilities for religious and educational work. For this purpose it entered into a contract with a development company for the conveyance of land, excepting therefrom a certain parcel designated on the accompanying map as "disputed land," on which complainant was to have certain exclusive privileges largely essential to the success of its enterprise; the purpose of the exception being to provide a site for an electric plant. The development company knew that the surroundings and control of the grounds must be such as to meet the approval of, and exclude everything not acceptable to, the Methodist Church, and complainant immediately took possession and proceeded with the work. *Held,* that, in view of the conduct of the parties and the surrounding circumstances, as shown by the evidence, the interest conveyed in the disputed strip was not a mere revocable license, but a permanent easement in the land.

2. DEEDS—INDEPENDENT INSTRUMENTS—INCLUSION BY REFERENCE.

Where a deed was made subject to the covenants and agree-

> ments in a certain recorded contract, which contained in
> great detail the obligations of the respective parties relating
> to the land to be conveyed, it was obviously the object to
> avoid reciting the provisions at length in the deed, and the
> provisions of the contract were by such reference made a
> part of the deed.

Cross-appeals from Mason; McAlvay, J. Submitted
October 8, 1903. (Docket No. 18.) Decided March 15,
1904.

Bill by the Epworth League Training Assembly against
F. Bert Olney, George R. Cartier, and the Citizens' Development Company, to quiet title. From the decree rendered, both parties appeal. Affirmed.

*Elvin Swarthout* (*John H. Grant*, of counsel), for
complainant.

*Dovel & Smith* (*M. B. Danaher*, of counsel), for defendants.

MOORE, C. J. A reference to the map attached will
help to understand the controversy.

The complainant corporation was organized under Act
No. 39 of the Public Acts of 1889 for the purpose, among
other things, as stated in its articles of association, "for
the purchase and improvement of lands to be occupied for
summer homes, for camp meetings, for meetings and
assemblies of associations and societies organized for scientific or intellectual culture, and for the promotion of
religion and morality." The defendant appellants claim
to be the owners of the land marked on the map as "disputed land." Complainant claims it had permanent rights
in the nature of an easement in the property, and that, because of the failure of the defendant the Citizens' Development Company to act, complainant now has the title in
fee to the disputed land, and this bill is filed for the purpose of settling the dispute. From a decree in favor of
complainant as to part of its contention, two of the defend-

ants have brought the case here by appeal. The complainant has also filed a cross-appeal.

The case was heard in open court. The trial judge filed a written opinion, which states the questions involved as follows:

" The dispute in this case is really a matter of the con-. struction of a certain contract and deed, taken in connection with the circumstances surrounding the organization of the complainant, and its location at what is now known as ' Epworth Heights,' in Mason county, directly north of the city of Ludington.

" The Citizens' Development Company, one of the defendants to this suit, a corporation organized to promote the business interests of the city of Ludington, in 1893 began negotiations relative to the location of a Methodist camp-meeting ground near the city of Ludington, and offered inducements to those interested in such camp-meeting ground at Reed City, Michigan, to change the location of the same to Ludington. These negotiations developed the idea of the formation of the complainant assembly, and the officers of the development company were the persons actively engaged in and who really promoted such organization.

" On May 4, 1894, these negotiations ripened into a contract made between the complainant, the Citizens' Development Company, and the Flint & Pere Marquette Railroad Company. This contract is of considerable length, but its principal features are that the complainant had become organized, and required certain lands and $21,000 in cash to properly establish itself; that the development company had certain lands which it would deed to the assembly, and would use its influence to procure $10,000 and certain lands from the city of Ludington (procuring necessary legislation therefor), would construct and maintain a street railway, and do certain other necessary things to establish the assembly at the place designated. The Flint & Pere Marquette Railroad Company, on its part, agreed to furnish $10,000 in cash, and give rates over its railroad and steamboat lines to those attending the assembly. The complainant agreed to accept the lands and invest the money in suitable buildings, and for the period of 15 years maintain annual meetings, furnishing a suitable program; it being the aim of the board of trustees to inaugurate work along the special lines of a training

school for Epworth Leaguers, a school for evangelistic training, a summer school for young preachers, classes in elocution, lecture courses, and kindred lines of religious and educational work.

"The lands described in this contract, which were to be conveyed by the Citizens' Development Company to the complainant, are located upon Lake Michigan, and are south of the Lincoln river, which is the outlet from Lincoln Lake into Lake Michigan, and is a stream of considerable size. The following among other lands were to be conveyed by the development company to complainant:

"'That part of lot 3, section 4, town 18 north, of range 18 west, lying south of the outlet of Lincoln Lake, excepting therefrom that parcel of land lying north of the line 1,000 feet south of and parallel to the east and west quarter line of said section 4, and west of a line 660 feet east of the north and south quarter line of said section 4, and parallel thereto; it being agreed that on this reservation the Epworth League Training Assembly may erect cottages, bath and boat houses, and shall have the exclusive right of all boat and landing privileges on the lake front and on the south side of the channel.'

"And in the contract it was provided as follows:

"'It is further mutually agreed that the said first party [development company] shall have the exclusive right to the water power from Lincoln Lake, and that the same may be used only at the present outlet of said lake; and, further, said first party shall have the right to erect the necessary poles and establish the necessary lines to convey the electricity they may generate by said water power through the said premises, and shall have a right of way across the premises herein conveyed to the aforesaid reservation until the erection of the proposed Charles-street bridge.

"'It is also further agreed that the lands herein conveyed shall be used by said third party [Epworth Assembly] only for the purposes herein mentioned, and not for the establishment of any mercantile or other business, other than necessary to properly carry on such assembly and league work, during the life of this contract.'

"Under this contract the parties proceeded, each on its part, to fulfill the terms thereof, and on the 22d day of May, 1894, the Citizens' Development Company deeded to the complainant the lands mentioned and described in such contract, and in the body of said deed, immediately following such descriptions:

"'This conveyance is made subject to the reservation of the right by said first party, or its successors or assigns, to rebuild and

maintain the dam at the outlet of said Lincoln Lake, and to hold the water of said Lincoln Lake at 12 inches above high-water mark. And this conveyance is made subject also to the covenants and agreements contained in a certain contract made between the Citizens' Development Company and the Flint & Pere Marquette Railroad Company and the Epworth League Training Assembly, which said contract was entered into on the 4th day of May, A. D. 1894, and is to be found of record in Book 2, Miscellaneous Records of Mason county, Michigan, at page 285.'

"The complainant the same year proceeded to develop its work, and, insisting later that the development company should fulfill its agreement relative to transportation of the members of the assembly and visitors to the grounds from Ludington to Epworth Heights, finally accepted the steam railroad which was built by a corporation composed largely of the same persons who composed and managed the development company. The proof shows that this mode of transportation was accepted by all parties connected with the contract as a fulfillment of said contract relative to transportation. The complainant assembly, through its officers and agents, and with the assistance of the Flint & Pere Marquette Railroad Company, soon became widely known, and made a remarkable growth, and is now conducted successfully in all respects, according to the terms of its contract and under its articles of association; being carried on for the purposes therein mentioned.

"The defendant development company became largely involved in debt, and, not being able to discharge its obligations to its creditors, gave a mortgage in June, 1897, to Davis Olney, as trustee, securing, among other indebtedness, the sum of $1,000 due to the complainant from the development company, according to the terms of the contract above referred to. This mortgage was afterwards foreclosed on the petition of the complainant, and the property therein described was sold, and bid in by the complainant, with a decree for deficiency, upon which a large amount is unpaid, and which it will be impossible to collect, by reason of the insolvency of the development company, which has practically gone out of business.

"On or about October 1, 1900, said development company executed and delivered to defendants F. Bert Olney and George R. Cartier a quitclaim deed of certain lands, as follows:

"'All its right, title, and interest in and to [among other lands] all that portion of lot 3 lying north of land heretofore sold to the

Epworth League Training Assembly, section 4, town 18 north, of range 18 west.'

"The grantees in said deed immediately afterwards redeemed all of the other lands from such foreclosure sale, and, by virtue of such quitclaim deed, began to assert title and right to the exclusive possession of the piece of land on lot 3 heretofore mentioned and described, and which will hereinafter be designated as the disputed strip.

"There is serious doubt whether this disputed strip was included in the mortgage referred to, given to Davis Olney. The description therein was, 'All that portion of lot 3 lying north of the Epworth League grounds in section 4.' The undisputed testimony of George N. Stray, who made the inventory of the property of the development company at the time this mortgage was made, shows that the disputed claim was not considered of any value whatever; and the undisputed testimony in the case is also to the effect that the complainant, from the time the contract was made up to the time of the quitclaim to Olney and Cartier, was in the undisputed possession of all of the lands up to the south shore of Lincoln river.

"Considerable testimony was taken in the case, and it appears to be established to the entire satisfaction of the court that those who represented the complainant at and before the time of entering into this contract, and at and after the deed was executed and delivered, understood and insisted that the complainant had the entire and exclusive possession and control of all the lands deeded, up to the south bank of Lincoln river, including the disputed strip, and such possession and control of that to the exclusion of everybody except the development company, which was to construct and maintain an electric power plant thereon. The disputed strip, with the river on the north, Lake Michigan on the west, and the land south and east absolutely deeded to the complainant, was in fact entirely cut off from all other lands owned by the development company.

"It is claimed on the part of these defendants, Olney and Cartier, that by their quitclaim deed from the development company they obtained the title in fee simple to this disputed strip, and that such deed, and notice given by them to the members of the complainant who had built or were building cottages thereon, and also to the complainant assembly itself, terminated what they claim was a license to occupy such disputed strip. This case turns upon this contention.

"The complainant assembly is organized under a statute of this State, and, by its articles of association, at all times two-thirds of its trustees must be members of the Methodist Episcopal Church; and its aim, as in said contract stated, is to establish a training school for Epworth Leaguers, evangelists, a summer school for young preachers, and other religious and educational work. The Epworth League is the young people's society of the Methodist Church, and is everywhere carried on in connection with it.

"In determining what the parties to this original contract and the deed intended, it is necessary to take into consideration all of the circumstances surrounding the transaction. It was well known to the development company that the members of the Methodist Church, in locating a camp-meeting ground, or a ground to be used for the purposes of an Epworth League Training Assembly, would require that its surroundings should be such as would be approved by the church and its membership generally, and also that such control of all of the grounds in which the assembly was to have any interest should be such as to exclude everything which would not be acceptable to the members of the Methodist Episcopal Church.

"From the proofs taken in the case, it appears that this disputed strip was excepted in the description for the purpose of erecting thereon an electric power plant, to be operated by water power. It does not appear that any other intention was expressed by the development company at the time, and the representatives of the complainant swear positively in this case that this was the expressed understanding and agreement. It would seem that the privilege of erecting poles on that part of the land deeded outright, for the purpose of conveying the electric power, and also the privilege of going over these lands, and the right to raise the water in Lincoln Lake 12 inches above high-water mark, can be intelligently understood if taken in connection with such understanding and agreement, but, without any such understanding and agreement, such statements in the writings between the parties are meaningless. The contract, in terms, states that on this reservation the complainant 'may erect cottages, bath and boat houses, and shall have the exclusive right of all boat and landing privileges on the lake front and on the south side of the channel.'

"It is claimed on the part of the defendants that this

amounts to a mere license, revocable at the option of the development company or its assigns. What interest in this disputed strip was created by this contract and embodied in the deed must be also determined from all the surroundings at the time. It is impossible to believe that the complainant accepted the right to build cottages, bath and boat houses, to the exclusive control of all boat and landing privileges on the lake front and on the south side of the channel, as a mere temporary affair, to be canceled at the whim of a new board of directors of the development company, or any persons to whom said company might make transfer of the title to the disputed strip. The court has personally examined these premises with reference to the location of the disputed strip and of the Epworth League Training Assembly grounds generally, and finds that, as has appeared in evidence on the part of the complainant, the river is the natural boundary of these premises on the north. It is a stream of considerable size and depth, and a most satisfactory place for boats, launches, etc., to be moored.

"It is clear to the court that, from the proofs, the contract, and reference to it, as above stated, in the deed, the complainant received and accepted from the development company an indivisible right and interest in the disputed strip; that it was not intended by either of the parties to the contract and deed that a mere license was created, and the conduct of the parties from the time possession was taken of the premises up to the time Olney and Cartier made claim under their quitclaim deed is opposed to any such conclusion.

"I therefore find that, by the contract to the complainant, a permanent and subsisting estate was created in the complainant to the disputed strip; that the title reserved in the development company and its assigns was subject to such estate, and was such title as would allow the erection and maintenance of the electric plant referred to, and for no other purpose.

"I find that the defendants Olney and Cartier, by actual knowledge of all the circumstances herein detailed, and by the established rules of law, by their quitclaim deed took only such title as the development company had in such disputed strip, subject to all the rights, title, and interest of the complainant."

The parts of the original contract referred to, necessary to recite here, read as follows:

" *Whereas,* an association has been organized under and by virtue of the laws of Michigan (Act No. 39 of the Public Acts of Michigan of 1889) for the purpose of the purchase and improvement of lands to be occupied for summer homes, for camp meetings, for meetings and assemblies of associations and societies organized for scientific or intellectual culture, and for the promotion of religion and morality, which association has been organized at Ludington, Mason county, Michigan; and

" *Whereas,* in order to inaugurate and maintain such an association, and to prepare suitable buildings, clear and ornament grounds, and adapt them to the proper uses of such an association, and to insure successful programs for such meetings and assemblies, it is estimated that certain lands and the sum of $21,000 in money will be necessary:

" *Therefore,* this memorandum of agreement hereby made and entered into by and between and on the part of the Citizens' Development Company of Ludington, Michigan, party of the first part, the Flint & Pere Marquette Railroad Company, party of the second part, and the Epworth League Training Assembly of Ludington, Michigan, party of the third part, witnesseth:

" That said Citizens' Development Company, party of the first part, in consideration of the premises and agreements herein made by said parties of the second and third parts, hereby agrees to deed by a good and sufficient warranty deed to said Epworth League Training Assembly, third party, granting unto it, or its successors, representatives, or assigns, the absolute title, subject only to the rights of reversion, all the following described lands, to wit:

" That part of lot 3, section 4, town 18 north, of range 18 west, lying south of the outlet of Lincoln Lake, excepting therefrom that parcel of land lying north of the line 1,000 feet south of and parallel to the east and west quarter line of said section 4, and west of a line 660 feet east of the north and south quarter line of said section 4, and parallel thereto; it being agreed that on this reservation the Epworth League Training Assembly may erect cottages, bath and boat houses, and shall have the exclusive right of all boat and landing privileges on the lake front and on the south side of the channel.   Also all of lot 4 of said section 4.   * * *   All said lands being in Mason county, Michigan.   Together with all rights of flowage on all lands bordering on Lincoln lake and river, whether the above

lands or others, intending to convey all such rights acquired by deed by said Citizens' Development Company. * * *

" Said first party further agrees that commencing with the opening of the season of 1894, and during the season of 1894 and for all time during the life of said Epworth League Training Assembly, they will establish, furnish, and maintain suitable conveyances to and from the depot and steamboat dock of the Flint & Pere Marquette Railroad Company to the grounds of said third party, at the rate of not to exceed five cents fare each way; and that it will establish, construct, and operate a street railway, or procure the same to be established, constructed, and operated, from said depot and steamboat dock to the grounds of said third party, at the earliest possible time, and have the same in operation not later than July 1st, 1896. * * *

"The Epworth League Training Assembly, party of the third part hereto, in consideration of the foregoing premises and agreements made and to be performed by said first and second parties, hereby promises and agrees to accept the title of the real estate herein mentioned, and to receive the said moneys, and will invest and dispose of the said moneys in constructing and erecting suitable permanent buildings upon said lands, and will keep and maintain the same in suitable repairs, to be used and occupied for the uses and purposes in this contract stated; and that it will hold a meeting during the summer season each year for the period of fifteen years upon the premises hereinbefore mentioned and described, such meetings to be of not less than two weeks' duration, and for as much longer time as in the judgment of the board of trustees of said third party it shall be deemed advisable.

" Said third party hereby promises and agrees faithfully to perform on its part all the necessary labor and to devote such time in arranging for speakers and for holding conventions, concerts, assemblies, camp meetings, and other gatherings as from time to time may be obtained, and to manage and conduct the same; it being the aim of the board of trustees of said third party to inaugurate work along the special lines of a training school for Epworth Leaguers, a school for evangelistic training, a summer school for young preachers, classes in elocution, lecture courses, and kindred lines of religious and educational work.

" Said third party agrees to subdivide its work in following out the lines herein indicated into proper committees;

to formulate and adopt suitable rules and by-laws to govern the assembly and its details, acting under and in compliance with the State law under which said assembly is organized; that it will, through its members and board of trustees, do all in its power to encourage parties to lease lots or plats of ground on the lands of the said Epworth League Training Assembly, and to erect summer cottages thereon, and otherwise beautify and adorn the same, and that they will in all respects strive to make the Epworth League Training Assembly attractive and second to none as a delightful summer resort.

"It is further mutually agreed that the said first party shall have the exclusive right to the water power from Lincoln Lake, and that the same may be used only at the present outlet of said lake; and, further, said first party shall have the right to erect the necessary poles and establish the necessary lines to convey the electricity they may generate by said water power through the said premises, and shall have a right of way across the premises herein conveyed to the aforesaid reservation until the erection of the proposed Charles-street bridge.

"It is also further agreed that the lands herein conveyed shall be used by said third party only for the purposes herein mentioned, and not for the establishment of any mercantile or other business, other than necessary to properly carry on such assembly and league work, during the life of this contract.   *   *   *

"Signed, sealed, executed, and delivered in triplicate by the parties hereto this 4th day of May, A. D. 1894.

"The CITIZENS' DEVELOPMENT COMPANY,
"ANTOINE E. CARTIER, President.
"O. DUNHAM, Secretary.
"The F. & P. M. R. R. Co.,
"W. H. BALDWIN, Jr., Gen'l Mgr.
"EPWORTH LEAGUE TRAINING ASSEMBLY,
"D. W. PARSONS, Pres. Epr.
"THOMAS NICHOLSON, Sec'y."

The contract was recorded in Miscellaneous Records, on pages 285 and 289.

Later a deed was made, reading in part as follows:

"'This indenture, made this twenty-second day of May, in the year of our Lord one thousand eight hundred and ninety-four, between the Citizens' Development Company, a corporation existing under the laws of the State of Mich-

igan, and having its office at the city of Ludington, Michigan, party of the first part, and the Epworth League Training Assembly of Ludington, Michigan, parties of the second part, *Witnesseth:*

"That the said party of the first part, for and in consideration of the sum of one dollar and other valuable consideration to it in hand paid by the said parties of the second part, the receipt whereof is hereby confessed and acknowledged, does by these presents grant, bargain, sell, remise, release, alien, and confirm unto the said parties of the second part, and unto their successors and assigns forever, the following parcels of land, to wit:

"That part of lot 3 in section 4, town 18 north, of range 18 west, lying south of the outlet of Lincoln Lake, excepting therefrom that parcel of land lying north of the line 1,000 feet south of and parallel to the east and west quarter line of said section 4, and west of a line 660 feet east of and parallel to the north and south quarter line of said section 4; and all of," etc.

"This conveyance is made subject to the reservation of the right by said first party, or its successors or assigns, to rebuild and maintain the dam at the outlet of said Lincoln Lake, and to hold the water of said Lincoln Lake at 12 inches above high-water mark.

"And this conveyance is made subject to the covenants and agreements contained in a certain contract made between the Citizens' Development Company and the Flint & Pere Marquette Railroad Company and the Epworth League Training Assembly, which said contract was entered into on the 4th day of May, A. D. 1894, and is to be found of record in Book 2, Miscellaneous Records of Mason county, Michigan, at page 285.

"Together with all and singular the hereditaments and appurtenances thereunto belonging or in any wise appertaining. To have and to hold the said premises as described, with the appurtenances, unto the parties of the second part, and to its successors and assigns, forever," etc.

The deed was duly signed, sealed, witnessed, acknowledged, and delivered.

Counsel for defendants contend:

"The privilege given to complainant by the contract to build cottages and of landing boats on this land amounted to a license, and not to a permanent interest in real estate.

The contract was not witnessed, acknowledged, or sealed. The language used in the clause upon which complainant relies does not import a grant or agreement to convey. The contract is not a proper form of instrument by which to convey an interest in real estate.

" The deed made in pursuance of the contract contained a clause, inserted after the description, that the conveyance was made subject to the covenants and agreements contained in the contract. This clause could not refer to the disputed land, which was not conveyed by the deed, but expressly excepted from the conveyance, and only mentioned in the deed for convenience in describing the land that was conveyed. This clause appears to have been intended to limit the warranty in the deed, since the contract limited the use of the land to the purposes of complainant corporation, and provided for the reversion in case of the failure of complainant."

We think this contention is not maintainable. The deed itself is a very short paper. The original contract was a very long one. It contained not only provisions as to the right of complainant to erect cottages, etc., on the disputed strip, but also provisions as to the raising from the citizens of Ludington of $10,000, and the payment of a like sum by the railroad company in installments, some of which were to be paid as late as July, 1896. It also provided for the maintenance of a line of transportation during the life of the complainant corporation from its grounds to the railroad depot and steamboat dock, with not to exceed a 5-cent fare, and also for the construction and operation of a street railway between those points. It also contained provisions for low rates of fare to the stockholders of complainant over the Flint & Pere Marquette Railroad line. It is very evident that to do away with the necessity of reciting these provisions at length in the deed was the object of referring therein to the original contract, as was done, and that it was expected that by such reference the provisions of the contract were made part of the provisions of the deed. Such, we think, was its effect. *Rorabacher* v. *Lee*, 16 Mich. 169; *Johnson* v. *Moore*, 28 Mich. 3; *Stuart* v. *Worden*, 42 Mich. 154

(3 N. W. 876); *Grieb* v. *Cole*, 60 Mich. 397 (27 N. W. 579, 1 Am. St. Rep. 533); 17 Am. & Eng. Enc. Law (2d Ed.), pp. 9, 10.

It is contended that, as both the deed and the contract excepted this disputed land from the conveyance, the legal title remained in the Citizens' Development Company, and that the privileges granted to complainant in said contract were of revocable license, which was revoked by the conveyance of the land to the defendants, and by the letters written by Cartier and Olney to complainant and to its lessees. If the interest of the complainant in the disputed strip were only that of a licensee, this contention could be sustained; but we think it is more,—that it is in the nature of a permanent easement. The language used in the contract is not very clear and certain, and it should be read in the light of all the circumstances surrounding the transaction. When so read, we think it warrants the conclusion of the trial judge, expressed as follows:

"From the proofs taken in the case, it appears that this disputed strip was excepted in the description for the purpose of erecting thereon an electric power plant, to be operated by water power. It does not appear that any other intention was expressed by the development company at the time, and the representatives of the complainant swear positively in this case that this was the expressed understanding and agreement. It would seem that the privilege of erecting poles on that part of the land deeded outright, for the purpose of conveying the electric power, and also the privilege of going over these lands, and the right to raise the water in Lincoln Lake 12 inches above highwater mark, can be intelligently understood if taken in connection with such understanding and agreement, but, without any such understanding and agreement, such statements in the writings between the parties are meaningless. The contract, in terms, states that on this reservation the complainant 'may erect cottages, bath and boat houses, and shall have the exclusive right of all boat and landing privileges on the lake front and on the south side of the channel.' * * *

"It is impossible to believe that the complainant accepted the right to build cottages, bath and boat houses, and the

right to the exclusive control of all boat and landing privileges on the lake front and on the south side of the channel, as a mere temporary affair, to be canceled at the whim of a new board of directors of the development company, or any persons to whom said company might make transfer of the title to the disputed strip.   *   *   *

" It is clear to the court that, from the proofs, the contract, and reference to it, as above stated, in the deed, the complainant received and accepted from the development company an indivisible right and interest in the disputed strip; that it was not intended by either of the parties to the contract and deed that a mere license was created, and the conduct of the parties from the time possession was taken of the premises up to the time Olney and Cartier made claim under their quitclaim deed is opposed to any such conclusion."

As to the claim of complainant that the title in fee should be held to be in it, we agree with the trial judge that the record does not show such a state of affairs as would warrant at this time such a decree.

The decree of the court below is affirmed.

The other Justices concurred.